1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11 | POWAY UNIFIED SCHOOL DISTRICT,

12                                 Plaintiff,

13    vs.

14 | KATELYN CHENG, by and through her
parents JERRY CHENG and ANN

15 | CHENG,

16                             Defendants.

17

CASE NO. 10CV0897-LAB (POR)

**ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT**

18      Poway Unified School District challenges the decision of an Administrative Law Judge

19 that K.C., a deaf student, is entitled to "word-for-word" transcription services under the

20 Individuals with Disabilities Education Act.  It is the District's position that "meaning-for-

21 meaning" transcription is sufficient.[1]  K.C., of course, believes that meaning-for-meaning

22

23 _____

24     [1] "Word-for-word" transcription is similar to what a court reporter does.  It creates,
essentially, a running, verbatim transcript of everything that is said in the classroom.  The

25 word-for-word transcription service preferred by K.C. is CART, which stands for
Communication Access Realtime Translation. "Meaning-for-meaning" transcription is not *as*

26 exact or thorough as word-for-word transcription, but the degree of the gap between them
depends on who is doing the critiquing.  According to the District, meaning-for-meaning

27 transcription captures almost all spoken words with great clarity and is the functional
equivalent of CART in all critical respects.  (Dkt. No. 23 at 17–19.)  According to K.C., it is

28 lumbering, unreliable, and does not capture enough of what is said in class.  (Dkt. No. 22-1
at 11–13.)  The meaning-for-meaning service offered by the District is called TypeWell.  The
ALJ addressed the relative capabilities of CART and TypeWell in his decision.  (*See* AR
123–124.)

                                              10CV0897

1    transcription is substantially inferior to word-for-word transcription, and that the

2    Administrative Law Judge got it right.[2]

3    **I.      Legal Background**

4           The Individuals with Disabilities Education Act, or IDEA, requires that "all children with

5    disabilities have available to them a free appropriate public education that emphasizes

6    special education and related services designed to meet their unique needs and prepare

7    them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

8    The Supreme Court defined the contours of a "free appropriate public education," or FAPE,

9    in *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458

10   U.S. 176, 203 (1982). *Rowley* is still controlling, even though IDEA has been amended

11   multiple times since it was decided. "The proper standard to determine whether a disabled

12   child has received a free appropriate public education is the . . . standard set forth by the

13   Supreme Court in *Rowley*." *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 951 (9th Cir.

14   2010). It is critical, then, to be clear on the Supreme Court's holding in *Rowley*.

15          The Court began by looking directly at the IDEA statute and finding that a FAPE

16   "consists of educational instruction specifically designed to meet the unique needs of the

17   handicapped child, supported by such services as are necessary to permit the child 'to

18   benefit' from the instruction." *Rowley*, 458 U.S. at 188. The Court then noted that it is

19   *access* to education, not so much the *substance* of the education received, that matters. *Id.*

20   at 192. Indeed, "the Act imposes no clear obligation upon recipient States beyond the

21   requirement that handicapped children receive some form of specialized education." *Id.* at

22   195. This "specialized education" need not provide disabled students with "every special

23   service necessary to maximize [their] potential," but rather a "basic floor of opportunity" and

24   //

25

26          [2] The Court understands that the typical course of action in challenging the decision
27   of an Administrative Law Judge is for the aggrieved party to initiate a new civil action
     challenging the decision, and then for both parties to file cross-motions for summary
28   judgment. Here, however, K.C.'s cross-motion is rather unnecessary. K.C. does not object
     to any portion of the ALJ's decision, and this dispute can easily be resolved on an opening
     brief from the District, an opposition brief from K.C., and a reply (if necessary) from the
     District.

1  "some educational benefit." *Id.* at 199–200. So long as a disabled student is able to benefit

2  educationally from a school, that school has provided her with a FAPE. *Id.* at 203.

3      The other major piece of IDEA, in addition to the FAPE requirement, is the

4  Individualized Education Program, or IEP. This is a collaborative effort of the school system

5  and the disabled student's parents, and the process by which a student's FAPE is

6  conceived. *See Schaffer v. Weast*, 546 U.S. 49, 53 (2005). IDEA requires that all disabled

7  students receive an IEP, 20 U.S.C. § 1414(d)(2), and it must include, among other things,

8  "a statement of the special education and related services and supplementary aids and

9  services, based on peer-reviewed research to the extent practicable, to be provided to the

10 child, or on behalf of the child, and a statement of the program modifications or supports for

11 school personnel that will be provided for the child." 20 U.S.C. § 1414(d)(1)(A)(i)(IV). The

12 IEP must be "reasonably calculated to enable the child to receive educational benefits." *R.P.*

13 *ex rel. C.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117, 1121 (9th Cir. 2011) (quoting *N.B.*

14 *v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1207 (9th Cir. 2008)).

15     State standards are also part of the IDEA analysis. *Rowley*, 458 U.S. at 203.[3]

16  _____

17  [3] The Court hesitates to say this and no more. *Rowley* holds that a FAPE "must meet the State's educational standards," but it is not obvious that "educational standards" refers

18  to, or incorporates, the accommodations to which disabled students are entitled under state law, as opposed to the *content* of the education received. It seems counterintuitive that IDEA would simply federalize all of the rights disabled students have under state laws,

19  including those that surpass the rights afforded by IDEA. *But see K.M. v. Tustin Unified Sch. Dist.*, Case No. 10-CV-1011, 2011 WL 2633673 at *6 (C.D. Cal. July 5, 2011) ("IDEA's

20  requirement of a FAPE includes meeting the standards of California's law protecting equal communication access for students with hearing disabilities.").

21     The Ninth Circuit has held that "[s]tate standards that are not inconsistent with federal standards are also enforceable in federal court." *W.G. v. Bd. of Trustees of Target Range*

22  *Sch. Dist. No. 23*, 960 F.2d 1479, 1483 (1992); *see also Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994) ("State standards that impose a greater duty to educate

23  handicapped children, if they are not inconsistent with federal standards, are enforceable in federal court under IDEA."). That is also the rule in other circuits. *See, e.g.*, *Thompson R2-J*

24  *Sch. Dist. v. Luke P., ex rel. Jeff P.*, 540 F.3d 1143, 1155 (10th Cir. 2008) (holding that 20 U.S.C. § 1407 "requir[es] state regulations to conform to federal law, but allow[s] the

25  possibility for state regulations not required by federal law"); *Stephen C. v. Radnor Tp. Sch. Dist.*, 202 F.3d 642, 647 (3d Cir. 2000) (holding that under IDEA "federal law incorporates

26  state standards, and a school district may violate the IDEA if it fails to satisfy the more stringent state law requirements") (internal quotations omitted); *Blackmon ex rel. Blackmon*

27  *v. Springfield R-XII Sch. Dist.*, 198 F.3d 648, 658 (8th Cir. 1999) ("When a state provides for educational benefits exceeding the minimum federal standards set forth under *Rowley*, the

28  state standards are thus enforceable through the IDEA."); *Doe By and Through Doe v. Bd. of Educ. of Tullahoma City Schools*, 9 F.3d 455, 457 (6th Cir. 1993) ("In this, and other circuits, it is settled that even if a school district complies with federal law, it may still violate

1   California law, however, does not require accommodations beyond those required by IDEA.

2   Cal. Educ. Code § 56000(e).

3        If parents are dissatisfied with their child's IEP, they may seek an administrative

4   hearing, referred to as an "impartial due process hearing," pursuant to 20 U.S.C. § 1415(f).

5   And after that hearing, any aggrieved party can bring a civil action in state or federal court.

6   20 U.S.C. § 1415(i)(2).

7   **II.   Procedural History**

8        On May 18, 2009, an IEP was convened to discuss K.C.'s transition from middle

9   school to high school.  That IEP lasted through June 9, 2009.  K.C.'s IEP team agreed that

10  she should receive transcription services, but it did not specify whether she should receive

11  word-for-word transcription or meaning-for-meaning transcription.   K.C.'s parents, who

12  insisted on CART, did not consent to the IEP for this reason.  Subsequently, on June 18,

13  they sent an email requesting CART transcription and were informed by letter on June 25

14  that the District would offer only TypeWell.[4]  On July 28, 2009 they requested the due

15  _____

16  the [federal] Act if it fails to satisfy more extensive state protections that may also be in
    place.") (internal quotations omitted); *Town of Burlington v. Dep't of Educ. for Com. of Mass.*,

17  736 F.2d 773, 789 (1st Cir. 1984) (holding that IDEA "incorporates by reference state
    standards, be they substantive or procedural, that exceed the federal basic floor of
    meaningful, beneficial educational opportunity").

18       But there are two wrinkles.  The first, which the Court has already mentioned, is that

19  California law expressly states it does not impose duties to accommodate greater than those
    imposed by IDEA.  The second wrinkle is that the Second Circuit has held that a district court

20  lacks jurisdiction over an IDEA appeal that turns solely on the interpretation of state law.
    *See Bay Shore Union Free Sch. Dist. v. Kain*, 485 F.3d 730 (2d Cir. 2007).  The question

21  in *Kain* was whether a second grader with Attention Deficit Hyperactivity Disorder was
    entitled to a teacher's aide at the private school he attended.  The parties agreed that under

22  IDEA he was not.  They disagreed, however, about the school district's obligations under
    New York's Education Law.  The Second Circuit recognized that IDEA incorporates some

23  state standards, but held that "assuming that IDEA incorporates the relevant New York
    Education Law, this does not provide an independent federal question that would sustain the

24  court's jurisdiction."  *Id.* at 734.  To the contrary, "[t]he determination whether New York law
    compels the School District to provide the one-to-one aide at a parochial school is a question

25  best left to New York courts."  *Id.* at 735.

26       [4] The response came from the District's Director of Special Education Theresa Kurtz.
    (AR 302.)  It took the position that it was enough for the IEP to provide for transcription *of*

27  *some kind*, and that the District "has the discretion to make decisions related to
    methodology."  It assured K.C.'s parents that the District carefully considered their input and

28  "discussed [K.C.'s] need for real-time, verbatim word-for-word transcription services versus
    real-time, meaning-for-meaning transcriptionist services," but that "[t]he ultimate offer from
    the District included the addition of real-time, meaning-for-meaning transcription services."

1   process hearing that the District now asks this Court to review.  Their request alleged that
2   the District's failure to provide K.C. with CART denied her a FAPE and violated the California
3   Education Code.

4       An Administrative Law Judge with the Office of Administrative Hearings heard
5   testimony on four days in December and found for K.C.: "[T]he District failed to provide
6   Student a FAPE in the May 18-June 9, 2009 IEP by its failure to provide her with CART in
7   English, Geometry, Biology, and Health classes."  (AR 132.)  The District was ordered to
8   provide K.C. with CART services immediately.  (AR 134.)

9   **III.   Discussion**

10      The ALJ summarized the law applicable to K.C.'s demand for CART and, in the
11  Court's view, got it mostly right.  He explained that "[i]n resolving the question of whether  a
12  school district has offered a FAPE, the focus is on the adequacy of the school district's
13  proposed program."  (AR 131 (citing *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1314
14  (9th Cir. 1987).)  He further explained that "[a] school district is not required to place a
15  student in a program preferred by a parent, even if that program will result in greater
16  educational benefit to the child."  (AR 131.)  The ALJ also gave significant attention to
17  *Rowley* and explained that "the IDEA does not require school districts to provide special
18  education students with the best education available or to provide instruction or services that
19  maximize a student's abilities."  (AR 131.)  He continued, "school districts are required to
20  provide only a 'basic floor of opportunity' that consists of access to specialized instructional
21  and related services which are individually designed to provide educational benefit to the
22  student."  (AR 131–132.)  This is all true.

23      The Court is mildly troubled, however, by the attention the ALJ gave to California
24  special education law without recognizing that it "does not set a higher standard of educating
25  individuals with exceptional needs than that established by Congress under the Individuals
26  with Disabilities Education Act."  Cal. Educ. Code § 56000(e).  The closest he came was to
27  say "California law creates specific state standards to address the needs of deaf students,
28  including the obligation to provide the pupil with equal opportunity for communication access
    that must be considered within the *Rowley* standard."  (AR 132.)  It is hard to know whether

1   the ALJ actually and improperly relied on California law in reaching his decision, however,

2   because in the "Determination of Issue" section of his decision he doesn't refer back to the

3   relevant law he previously summarized.  (AR 132–34.)

4          Looking past the manner in which the ALJ relied upon California law in ordering the

5   District to provice K.C. with CART, the Court finds that the ALJ applied a higher FAPE

6   standard than the one he recognized was articulated in *Rowley*.   Rather than focus on the

7   adequacy of TypeWell and whether the District's offer would provide K.C. with a "basic floor

8   of opportunity" and "some educational benefit," the ALJ appears to have considered the

9   relative merits of TypeWell and CART and required the transcription service that would

10  benefit her more.  He cited the testimony of K.C.'s middle school science and math teacher

11  that CART "would be most beneficial" to her, and the testimony of this teacher and another

12  that K.C. "would benefit greatly from CART."[5]  (AR 133.)  Following a description of the

13  capabilities of CART, he found that "CART is more appropriate than 'meaning-for-meaning'

14  systems in classes which are language-dense instruction with lecture and/or class

15  discussions as the main means of teaching." (AR 133.)  *Rowley* is clear that this isn't the

16  right analysis.   K.C. is not entitled to the "most beneficial" accommodation, or the

17  accommodation that will benefit her "greatly."  *Rowley*, 458 U.S. at 199–200.  Nor is the

18  relevant question whether CART is "more appropriate" than TypeWell, but rather whether

19  TypeWell would deprive her of the FAPE to which she is entitled under IDEA.  The ALJ said

20  "CART was the appropriate transcription service to meet Student's unique needs." (AR 133.)

21  But again, that misstates the inquiry.  CART may be appropriate to meet K.C.'s needs, but

22

23  _____
    [5] The District suggests that K.C.'s social studies teacher, Jeanine Ulgade, explained
    to the IEP team "that she was by no means advocating for a particular transcription service."
24  (Dkt. No. 23 at 15.)  The District doesn't cite to the record until the end of the paragraph
    containing that sentence, and the Court does not find support for the sentence on the page
25  cited to. (*See* AR 196.)  In any event, Ugalde did say that transcription would benefit K.C.
    without specifying CART or TypeWell (AR 125), and subsequently advocated for a
26  transcription service that would provide K.C. "the opportunity to somehow 'get' every single
    word that's being said during instruction including student comments" (AR 126–127).  This
27  can reasonably interpreted as a reference to CART.  Susan Lage, K.C.'s algebra and
    physical science teacher, said in an email that "CART would be most beneficial." (AR 126.)
28  This dispute as to the record is largely immaterial, however, because the Court has already
    indicated that the proper question in assessing whether K.C. has been offered a FAPE is *not*
    whether she has been offered the transcription service that would prove most beneficial to
    her.

1    it does not follow from that conclusion that TypeWell is *in*appropriate, and would deny her

2    a FAPE.[6] "Even if the services requested by parents would better serve the student's needs

3    than the services offered in an IEP, this does not mean that the services offered are

4    inappropriate, as long as the IEP is reasonably calculated to provide the student with

5    educational benefits." *See D.H. v. Poway Unified Sch. Dist.*, Case No. 9-CV-2621, 2011 WL

6    883003 at *5 (S.D. Cal. Mar. 14, 2011) (affirming conclusion of ALJ that deaf student was

7    not entitled to CART under IDEA).[7] So long as TypeWell confers "some educational benefit"

8    upon K.C., it satisfies IDEA. *Mercer Island Sch. Dist.*, 592 F.3d at 947; *see also Hellgate*

9    *Elementary Sch. Dist.*, 541 F.3d at 1213 n. 2; *K.S. v. Fremont Unified Sch. Dist.*, Case No.

10   10-15099, 2011 WL 1362467 at *1 (9th Cir. 2011) (applying "some educational benefit"

11   _____

12   [6] In the "Factual Findings" section of his decision, in recounting the testimony of the
     District's expert, the ALJ wrote, "In order to determine which transcription service is most
13   appropriate for a student, it is essential to look to the student's IEP goals and determine the
     level of support the student requires." (AR 129.) He continued, "CART is a more
14   appropriate system for use in classes with a high density of language. CART is more
     appropriate than the 'meaning-to-meaning' systems in classes that are more language-
15   dense, especially where lecturing is the main method of teaching." (AR 129–130.) It is not
     clear whether these were the views of the District's expert, or the ALJ's own commentary,
16   but either way they show the ALJ to be engaged in precisely the comparative analysis that
     this Court believes is not contemplated by *Rowley*. *See Prescott Unified Sch. Dist.*, 631 F.3d
17   at 1122 ("The IDEA accords educators discretion to select from various methods for meeting
     the individualized needs of a student, provided those practices are reasonably calculated to
18   provide him with educational benefit.").

19   [7] K.C. tries to distinguish *Poway Unified Sch. Dist.* from her case on two bases. One,
     the plaintiff was a middle school student, not a high school student. Two, the IEP at issue
20   did not find *any* transcription service necessary for the plaintiff to benefit from her
     education — although the school district did offer her meaning-for-meaning transcription
21   service *after* she objected to the IEP and demanded CART. These are fair points; a demand
     for CART is certainly more plausible when transcription services are necessary than when
22   they are not. At the same time, the plaintiff in *Poway Unified Sch. Dist.* was hearing-
     impaired in much the way K.C. is and received similar accommodations apart from the offer
23   of transcription services. So, the cases may not be as factually distinguishable as K.C.
     argues they are. K.C. also suggests that *Poway Unified Sch. Dist.* is on appeal, but actually
24   only a partial summary judgment was issued and cross-motions for full summary judgment
     are now pending before the district court. (*See* Dkt. Nos. 35–36.)
25       *Tustin Unified Sch. Dist.*, in which the district court affirmed an ALJ's decision that a
     deaf student was not entitled to CART under IDEA, is similar to *Poway Unified Sch. Dist.*
26   It is true, as K.C. argues, that the IEP at issue in *Tustin Unified Sch. Dist.* did not recommend
     any kind of transcription service, although the school district "raised the possibility of
27   TypeWell" during the IEP process. *Id.* at *4. But again, the plaintiff's impairment was similar
     to that of K.C.'s, and the district court's finding certainly has some persuasive value in this
28   case. "Most critically," the district court held, "the fact that CART services would 'maximize'
     K.M.'s potential does not mandate the District to provide them so long as the District was
     providing sufficient accommodations for K.M. to offer her a reasonable educational benefit."
     *Id.* at *13.

standard).  The ALJ, however, appears to have not asked that question.

In fairness, the ALJ does suggest at the end of his decision that there is something categorically inadequate about TypeWell, wholly apart from the relative superiority of CART. Specifically, he held that due to the density of communication in K.C.'s high school classes and the nature of those classes, TypeWell would deprive her of access to instruction.  (AR 134.)  This analysis is still slightly off.  The "access" *Rowley* concluded a FAPE must guarantee is access to *education*, not particular levels of instruction.  Indeed, "in seeking to provide such access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful."  *Rowley*, 458 U.S. at 192.  "Congress expressly recognize[d] that in many instances the process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome."  *Id.* (internal quotations omitted).

In addition to the above, the Court is also concerned that the ALJ failed to heed the Supreme Court's holding in *Rowley* that an IEP "should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade."  *Rowley*, 458 U.S. at 204.  His factual findings included "[K.C.] does well academically" and "[K.C.] continued to do well during the eighth grade and received trimester grades for social studies of B-, B, and B; language arts of B, A-, and B+; physical education of A+, A-, and A+; Physical Science of B, B, and B; and Algebra of A-, A-, and A-."  (AR 123.)  He cited the testimony of K.C.'s math and science teacher that, even without transcription, K.C. could earn an A or B in math and a B in science.  (AR 125.)  But in finding that K.C. was entitled to CART, the ALJ focused exclusively on the fact that leading up to the May 18, 2009 IEP meeting, when K.C. was receiving no transcription services at all, her grades had been declining.[8]  (AR 133.)

---

[8] It is unclear from the record whether *all* of K.C.'s grades were declining or only *some* of them.  Jeannine Ugalde, K.C.'s language arts and social studies teacher, testified that K.C.'s grades were decreasing as the school year progressed (AR 125), but there is no indication that this was true of K.C.'s grades across the board.  (*See* AR 123 ("Student continued to do well during the eighth grade."); AR 125 ("Student was an 'A' student in Algebra, a course she was repeating; while in science, she was a 'B' student."); AR 195 ("[K.C.] continues to excel in Science and Math.").)  The ALJ, however, found that "Student had not met her single goal of the IEP, *Student's grades were falling*, and both of her

The proper question under *Rowley*, however, is not that, but whether TypeWell would enable K.C. "to achieve passing marks and advance from grade to grade."[9]  *Rowley*, 458 U.S. at 204.

Finally, while the ALJ referenced all of the accommodations provided to K.C., he appears to have factored only the transcription service offered into the FAPE analysis.  In addition to meaning-to-meaning transcription, K.C.'s IEP called for preferential seating in her classrooms, a second set of textbooks at home, copies of teachers' notes when necessary, closed captioning, and a peer note-taker in one of her classes.  K.C. was also to be provided with an auditory FM system to presumably amplify sounds, a special laptop for videos with closed captioning, and a closed-captioning decoder.  (AR 190.)  This must be taken into account.  *See Poway Unified Sch. Dist.*, 2011 WL 883003 at *6 (factoring other accommodations provided to hearing-impaired student into the FAPE anaylsis).

———————————————

teachers were of the opinion that she would greatly benefit from CART." (AR 133 (emphasis added).)  In high school, presumably when K.C. was receiving TypeWell service, K.C. "was an 'A' student in all subjects."  (AR 127.)  While this certainly cuts against her claim that TypeWell denied her a FAPE, an IEP must be evaluated in light of the information *then* available.  *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999).  The ALJ recognized this.  (AR 131.)

[9] K.C. argues that "[p]assing grades alone are not FAPE and do not establish that the district has met its obligation to craft an educational program designed to meet K.C.'s unique needs."  (Dkt. No. 22-1 at 17.)  She cites *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307 (9th Cir. 1987) and 34 C.F.R. 300.101(c)(1).  K.C. does not provide a pin cite in *Gregory K* for this point, and the Court does not find it in the decision.  Section 300.101(c)(1) of the C.F.R. provides that "[e]ach State must ensure that FAPE is available to any individual child with a disability who needs special education and related services, even though the child has not failed or been retained in a course or grade, and is advancing from grade to grade."  The Court reads this differently than K.C. does.  Just because advancing disabled students are entitled to a FAPE does not mean that the manner in which they are advancing has no bearing on the question whether they are receiving a FAPE.

In her opposition to the District's motion for summary judgment, she argues that "changes to IDEA since *Rowley* . . . include an obligation to consider the communication needs of the student regardless of grades or other progress made at school" and she cites 20 U.S.C. § 1414(d)(3)(B)(iv) and Cal. Educ. Code § 56341.1(b)(4), which are basically identical.  (Dkt. No. 24 at 10.)  Section 1414(d)(3)(B)(iv) requires an IEP team to "consider the communication needs of the child, and in the case of a child who is deaf or hard of hearing, consider the child's language and communication needs, opportunities for direct communications with peers and professional personnel in the child's language and communication mode, academic level, and full range of needs, including opportunities for direct instruction in the child's language and communication mode."  None of that modifies or undercuts the Supreme Court's holding in *Rowley* that an IEP and personalized instruction should enable K.C. to "achieve passing marks and advance from grade to grade."  *Rowley*, 458 U.S. at 204.

1   **IV.    Conclusion**

2         The ALJ held a lengthy hearing in this case and worked his way through a dense

3   factual record, and the Court respects his efforts.  The Court finds, however, that he simply

4   did not apply the "some educational benefit" standard set forth in *Rowley.*  Instead, as the

5   District suggests, he focused excessively on the relative merits of CART as compared to

6   TypeWell and in so doing "required that the District offer a potential maximizing IEP to the

7   Student."  (Dkt. No. 23 at 21.)  The ALJ's decision is therefore **VACATED**, and this matter

8   is referred to him for further proceedings consistent with this Order.[10]  The parties' cross-

9   motions for summary judgment are **DENIED WITHOUT PREJUDICE**.

10

11         **IT IS SO ORDERED**.

12  DATED:  September 23, 2011

13                                                  *Larry A. Burns*

14                                                  **HONORABLE LARRY ALAN BURNS**
                                                    United States District Judge

15

16

17

18

19

20

21

22

23

24  _____

25         [10] The ALJ needn't hold another hearing if he believes he can reach a decision
    consistent with this Order without one.  The Court remands this matter only because the
26  case law suggests that is the proper course.  *See, e.g.*, *Mercer Island Sch. Dist.*, 592 F.3d
    at 946 (district court reversed ALJ's findings following a due process hearing and remanded
27  the matter); *see also K.S. ex rel. P.S. v. Fremont Unified Sch. Dist.*, 679 F.Supp.2d 1046,
    1049 (N.D. Cal. 2009) (district court remanded to ALJ for "redetermination of whether plaintiff
28  received a FAPE under the District's IEPs").  If the parties believe the Court should not
    remand this case to the ALJ and make a determination itself whether the District has
    complied with IDEA based on the administrative record, they may file a brief articulating that
    position within 7 days of the date this Order is entered.

                                    - 10 -                                      10CV0897